CHANCERY.

Case 58.

October 27.

Case stated.

# Macey's Ex'ors *vs* Fenwick's Adm'r.

## ERROR TO THE SCOTT CIRCUIT.

*Mortgages. Executors. Statute of Frauds. Parties.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

THIS is the fourth time this case, in some shape, has been before this Court. In June, 1822, Fenwick filed his bill to redeem certain slaves which he alledged had been pledged to Macey; and the Circuit Court having decided against his right to redeem, the decree was reversed by this Court. The opinion, together with a full history of the facts, is reported in 1 *Dana*, 276. Upon the return of the cause to the Circuit Court, Fenwick in the mean time having died, Holton, his administrator, filed a bill of revivor against the executors of Macey, to revive and carry into execution the mandate of this Court, which, upon certain terms, required a surrender of the slave, Anna, and her children, which had increased to five in number. The executors answered this bill of revivor, and showed, that before the institution of Fen-

wick's original bill, Macey had mortgaged the said slaves to the Bank of Kentucky, with other property, to secure a large sum of money due; that the Bank had filed their bill against them, as executors of Macey, and his devisees, and had obtained a decree of foreclosure and sale, under which the slaves, Anna and her children, had been sold, and were purchased by Leander W. Macey, in whose possession they then were. They deny that the slaves were then, or ever had been, in their possession as executors or otherwise; alledge that they were allotted to the widow of the decedent, as dower, upon her renunciation of the provisions of the will of her late husband, in whose possession they had, before the allotment, remained; that Macey's estate was insolvent and no assets were in their hands, and exhibit a record of the proceedings of the suit of the Bank, by which it appears that the proceedings alledged were had upon a bill filed in 1825, and that a final decree was obtained on the 7th of August, 1830, the next day after Fenwick's bill had been dismissed, and that a sale of the slaves had been made under the decree, which had been returned to, and was sanctioned and confirmed by the Court, at which sale L. W. Macey had become the purchaser, and had taken and then had the possession of the slaves. The mortgage deed exhibited was executed by Lewis and Macey, bears date in February, 1822, and was duly recorded on the same day, and is made subject to a deed of trust on said slaves and other property, executed by Macey to Blanton and Weisiger, to secure, among other debts, a large debt to the Bank, and which was executed and recorded on the 30th of October, 1821. The executors deny that they or the Bank, or the Trustees, or any person holding under the mortgage or deed of trust, had any notice of Fenwick's claim upon the slaves, at the date of the mortgage or deed of trust. The Circuit Court ordered the slaves to be surrendered by the executors or those in whose hands they were; and an attachment having issued against the executors, for failing to surrender, they appeared and showed for cause, the matters before shown in their answer, and the Court discharged them from the attachment, at the March term, 1836. A petition was

MACEY'S EX'RS.
vs
FENWICK'S AD'R

then filed against L. W. Macey, the purchaser, to coerce from him a surrender of the slaves. He answered, setting up the same matters before set up by the executors, and that he was no party to the original suit; had purchased under the Bank decree, foreclosing their mortgage, which was paramount to the claim of Fenwick, and, was not concluded by his decree, to which the Bank was no party. The Circuit Court decided against him and decreed that he should surrender the slaves. That decree was reversed by this Court, and the cause remanded for further proceedings. The opinion is reported in 9 *Dana*, 198. After the reversal by this Court, an action of detinue was brought against L. W. Macey, which, after it had been tried in the Circuit Court and was reversed in this Court, upon a technical point, and remanded, it was finally dismissed. Afterwards, this proceeding was instituted in 1840, by supplemental bill, against two of the executors and the administrator of Noel, the other, who had died, to render them responsible, *de bonis propriis*, for the value of the slaves, Anna and her children, and their hire. The executors and administrator of Noel, answer, relying upon the same matters set up in their former answer, insisting that they had acted in perfect good faith in this whole matter, and at the time of the sale under the Bank decree, Morris, one of the executors, was in another State, 1500 miles from Frankfort, when the sale was made. The entire proceedings against L. W. Macey was dismissed agreed, and the Circuit Court, on the hearing of the supplemental bill, decreed against the executors, *de bonis propriis*, and the administrator of Noel, $7356 25, and they have appealed to this Court.

The proceeding originally revived against the executors was a proceeding against them in their representative character only, and could conclude no other right or claim to the slaves than the right of Macey. The right of the Bank or of any other who was not made a party, which had originated before the commencement of the suit, could not be concluded or affected. Macey's right to the slaves, as between him and the Bank, was an equity of redemption only, and the right of the executors was no

greater. It is true Macey died in possession, and the executors might have taken the possession, but they deny that they ever did; yet that possession was liable to be divested, at any time, by an action at law, by the Bank, or proceedings in Chancery, and the executors had no power successfully to resist it.

In that event, as Macey might have been made person- <span style="float:right;">To render executors liable, *de bonis propriis*, it must appear that they have acted in bad faith, or been guilty of fraud or gross negligence.</span> ally liable for their value, so his assets in the hands of his executors, if any, might have been made liable. But to subject the executors to personal responsibility, it must be shown that they have been guilty of bad faith, gross negligence or fraud towards Fenwick, in relation to those slaves. There is no ground for the imputation of either against the executors, in this case, unless their failure to compel Fenwick to bring the Bank before the Court, or compel them to interplead and settle their conflicting claims to the slaves, shall amount to it. This would, no doubt, have been the safer course for them to have taken, and by taking it, they would have saved themselves from the vexatious litigation to which they have been subjected. But we are not prepared to concede that their omission to do so, is such evidence of bad faith, fraud or gross negligence, as should subject them, according to the principles which govern Courts of Chancery, and independent of the statute, to so heavy a penalty as to be rendered personally responsible for the whole value of the slaves and their hire.

It was the province and duty of Fenwick to have <span style="float:right;">It is the duty of mortgagor, seeking a redemption, to bring a subsequent incumbrancer, claiming under mortgagee, before the Court, if known.</span> brought the Bank and all persons interested before the Court. The mortgage to the Bank and deed of trust to Blanton and Weisiger for their use, had been recorded long before his suit was instituted, and the proceeding of the Bank was depending in the same Court in which his proceeding was depending for years before the decree of foreclosure and sale were made, and he stood by when the sale was made. It must be presumed that he was well apprized of the proceeding, yet he cautiously avoids bringing the Bank before the Court, or taking any step to arrest their proceedings, and his grounds of complaint now is, that the executors did not *compel* him to do that which it was his duty to do, as the only means of con-

MACEY'S EX'RS.
*vs*
FENWICK'S AD'R

cluding the Bank's claim. After thus failing to do his own duty, and standing by and permitting the slaves to be wrested by a decree of the Court from the hands of the executors by the Bank, whose claim as to them and their testator was certainly paramount to theirs, and could not, from any thing that appears in the record, be successfully resisted by them, he or his administrator turns upon the executors, and by supplemental bill, seeks to subject them to personal responsibility for no other neglect or omission than that they failed to compel the complainant to do that which it was his duty to do as the only means of concluding the Bank and settling, finally, his right to the slaves. It would certainly, under such circumstances, be a harsh exercise of the Chancellor's powers to render them personally responsible, and when it appears that their testator died insolvent, and no assets have come to their hands out of which they could be indemnified. But if they could, in a Court of Equity, according to the principles of the common law, be made responsible, *de bonis propiis*, we cannot admit that they can be made liable since the enactment of the statute of 1811. That statute provides, "that no executor or executors, administrator or administrators, shall be made liable for more than the amount of assets which have come or may come into his, her or their hands, to be administered on account of having failed to plead or make defence, or on account of any plea or pleas which he, she or they have heretofore or may hereafter plead to *any suit* or *action* whatever, determined, brought or to be brought or prosecuted against him, her or them, or either of them : but the judgment of the Court in all such cases shall only render such executor or executors, administrator or administrators liable for the amount of assets in his, her or their hands unadministered:" (1 *Statute Law*, 672.) It has been determined by this Court in the case of *Carroll, &c.* vs *Connett,* (2 *J. J. Marshall,* 208–9,) that this statute applies as well to suits in chancery as to suits at law. And if even the case before the Court should not be deemed to be embraced within the letter of the law, it falls certainly within its spirit.

The statute of 1811, (1 *Statute Law,* 672,) applies to proceedings in chancery against executors and administrators as to actions at law: (2 *J. J. Mar.* 208–9.)

If, therefore, the executors could, in any event, be made personally liable for property taken out of their possession and control by the order and decree of a Court of Chancery, on the ground of their failure to plead or omission to require the adversary claimants to interplead, we incline to the opinion it could not be done, when bad faith or a fraudulent combination with the other party was not shown, even if his title, upon a full litigation of the adversary claims, were determined to be the superior, and especially when, as in this case, he had a fair opportunity afforded him to make the question with the proper parties, and have the superiority of his right determined before the property was wrested from the control of the executors.

But if even in such a state of case they might be made personally liable, we are perfectly satisfied that they cannot be made liable, when, as in this case, the superiority of the complainant's right has never been litigated or determined with the proper parties before the Court, and when, from all that appears in this case, it is obvious that the claim of the Bank was paramount and superior to that of Fenwick, and had he been made to interplead with the Bank he could not have succeeded against them. This may have been the motive of his counsel in their apparent marked determination never to bring the Bank before the Court or to come in conflict with its title.

It appears that as early as 1807, Fenwick executed an absolute bill of sale to Macey for the slave, Anna, who is the mother of the other slaves in contest; that at the same time he took from Macey an instrument of writing, by which he reserved the right to redeem her in two years, upon refunding the price. This writing was never recorded, and as early as 1810, Macey was put into the possession of her and remained in possession until his death. His possession was, therefore, more than twice five years before the deed of trust or mortgage to the Bank was executed, and his *reservation* falls directly under the denunciation of the last clause of the second section of the statute of Frauds and Perjuries, by which it is declared fraudulent as to creditors and purchasers, and

MACEY'S EX'RS.    that the absolute property is with the possession : (1 *Stat.*
 *vs*
FENWICK'S AD'R   *Law,* 739.)

    The Bank, as a mortgagee, was a purchaser at least to
Mortgagees are   the extent of her claim, as has been frequently settled by
purchasers to the
extent of the    this Court.   She was also a creditor, and has manifested
sum due upon     her right to that character by her decree.   Had the Bank
the mortgage.
been brought before the Court by Fenwick, or had he
been required to interplead with the Bank, from any thing
that appears in the record, he could never have succeeded
in overreaching or in any manner affecting her claim :
but the same result would have taken place that did take
place, and he would have been driven back to his remedy
against Macey's estate for the value of the slaves.   His
claim was void as to the Bank, and neither he nor the ex-
ecutors possessed the power, successfully, to resist the
Bank's claim to the slaves.   Upon no principle of pro-
priety, reason or justice, therefore, can he make the exec-
utors liable, personally, for yielding to that claim.

    If the claim of the Bank was not genuine, but was
feigned, and contrived to defraud Fenwick, or the debts
secured had been paid off, and the proceeding was insti-
tuted to cover over the property, and the executors com-
bined with the Bank to effect that object, this should have
been proven, and cannot be presumed, if even the ques-
tion could be raised without bringing the Bank and pur-
chaser before the Court.

    Though the slaves were sold at a great sacrifice, that
may have been produced by the outstanding claim of
Fenwick, or the outstanding deed of trust to Blanton and
Weisiger, which was of prior date to the mortgage to the
Bank.   Whatever may have produced it, it is not shown
that it was caused by any fault on the part of the execu-
tors.   And the report of the sale was returned to and
sanctioned by the Court, without objection on the part of
Fenwick, or any effort to set it aside, though he was pres-
ent when the sale was made, and must have been well ap-
prised of its terms.   If the sale could be successfully im-
peached, the Bank would still have a paramount claim
upon the slaves, to the extent of her unsatisfied demand
against the estate of Macey.

The decree of the Circuit Court is, therefore, reversed, and the cause remanded, that the supplemental bill may be dismissed with costs, and the appellants are entitled to their costs in this Court.

[Upon suggestions made by defendant's counsel, the Court made this modification to the foregoing opinion :]

We have examined the earnest but respectful suggestions of the counsel for the defendant in error in this case, and without intimating any opinion as to his right to the remedy suggested, or any other, we have deemed it proper to change the mandate as follows : That the decree of the Circuit Court be reversed and cause remanded that the supplemental bill may be dismissed only so far as it seeks to render the executors liable *de bonis propriis.*

*Morehead & Reed and Crittenden* for plaintiffs : *Todd and Owsley & Goodloe* for defendant.